Coös,
Feb. 2, 1943. } No. 3343.

FRANK RIDEOUT, *Adm'r v.* BOSTON & MAINE RAILROAD.

*Bernard Jacobs* and *Crawford D. Hening* (by brief and orally), for the plaintiff.

*Hinkley & Hinkley* (*Mr. Irving A. Hinkley* orally), for the defendant.

BURQUE, J.   The deceased (hereinafter referred to as Herman),
was traveling easterly in a sedan automobile on a meadow road
leading to the railroad grade crossing, at a speed of twenty miles per
hour.   He approached the track at practically right angles to it and
drove onto the track in front of the defendant's train, which was
coming in a northerly direction.   The train was propelled by a
"gas-electric" car traveling at a speed of thirty miles per hour, and
consisted of the "gas-electric" and an express car.   As one ap-
proaches this crossing on this meadow road, one comes to a tool
house on the southerly side of the road.   This tool house is ninety-
eight feet long, and from the easterly end of the tool house there is a
distance of ninety-five feet to be traveled before reaching the west-
erly rail of the railroad track.   There is a fence five feet high along
the westerly side of the railroad right of way, a distance of forty-
seven feet from the easterly end of the tool house, and forty-eight
feet from the westerly rail.   The fence is of wire with laths in
front, and bushes grown up to the top of the fence.   The railroad
bed is one and two-tenths feet higher than the roadway near the east
end of the tool house.   This roadway has a slight rise before reach-
ing the westerly rail.   At the gateway in the fence it is three-tenths
of a foot higher than the roadway at a point fifty feet westerly of
the gateway.

Prior to the accident Herman and other men had, to the knowl-
edge of the defendant, been engaged for some two or three weeks in
digging potatoes in a field located westerly of the railroad.   The
potatoes would be loaded on a truck and carted away to a potato
house located on the easterly side of the railroad, and southerly of the
crossing.   Trucks were used for that purpose, and eight or ten loads
might be carted across the railroad daily.   On this particular day a
truck was loaded and started on its way.   It proceeded ahead of
Herman, and went over the crossing ahead of the train.   Herman
was following at a distance not definitely established, but at least
one hundred and ninety-five feet away.

It can be found that the train was anywhere from one hundred to
two hundred and fifty feet away when the operator (hereinafter re-
ferred to as the engineer) of the gas-electric car, seeing men on the
rear of the truck waving, started blowing the horn of the gas car.
The engineer testifies that he did not know what the waving was for,
either "apparently trying to attract somebody's attention" — or
"trying to shoo a hen off the track or a cow or something like that,
I had no way of telling what it was, whether they had succeeded

in doing what they were attempting to do and I couldn't see a thing."

The engineer did not discover the waving was to stop an automobile coming towards the crossing until the automobile came into his view as it came through the gateway. The engineer was then sixty to seventy feet away from the crossing. He immediately applied the emergency brake, opened the sanders, the wheels locked; but he was unable to avoid the accident. Herman did not reduce his speed, but kept right on coming. The inevitable result was a collision.

Plaintiff, in an attempt to establish defendant's negligence, argues that had the engineer put on his brakes at the time he saw the men waving, the accident could have been avoided, and in support of this contention introduces expert testimony tending to establish the degree of retardation which would have resulted had this been done, claiming this would have been sufficient to allow Herman to cross in safety. Just what was the defendant's duty?

First we start with the undisputed propositions that the defendant had the right of way; and second that the engineer had the right to assume and expect that any one approaching the crossing in an automobile would do so with care, and at a reasonable and proper rate of speed, so that if a train were approaching he could stop in time to avoid a collision.

There is nothing in the case to establish the fact that the engineer had or should have had any notice of impending danger, until such time as he saw Herman's automobile at the barway, forty-eight feet away from the westerly rail.

When the engineer first saw the men in the truck waving, the waving was not a warning or signal to him, but was directed to the decedent to notify him of a train's approach. The decedent was not in range of the engineer's sight and the engineer had no notice that the waving signified more than a warning that a train was approaching the crossing. With a view of the road westerly from the track of nearly one hundred feet, in which distance a motor vehicle would have ample time to be stopped if its driver were observant of due care, the engineer at that time had no duty of care to act beyond blowing the horn. So far as the situation was disclosed to him, he was at most called upon to do no more than join with the waving men in giving notice of the train's approach. He was not required to anticipate inattention to the warning or heedless and unsafe driving on the part of anyone not in view, but possibly on the road. No duty to retard the train's speed then existed.

When the engineer did see the automobile the train was then sixty to seventy feet away from the crossing. It must be conceded it was then too late to avoid the collision. If it can be said that the engineer should have discovered the automobile when it had passed the easterly end of the tool house, ninety-five feet away from the westerly rail, it cannot be found even then that he should have sensed danger. He had the right to assume, until such time as he can be charged with the duty of having to realize otherwise, that the traveler in the road would give way to the train. *Morier* v. *Hines*, 81 N. H. 48, 51, 52. If the train was then two hundred and fifty feet away from the crossing, the greatest distance the evidence can allow, and the engineer had applied the brakes, it cannot be found that the train could have been stopped before reaching the crossing, as it went five hundred and eighty-six feet beyond the crossing after the collision. There is no evidence the train could have been stopped within a shorter distance. The train, traveling at thirty miles per hour, would cover approximately 45 feet per second, which means that from a point two hundred and fifty feet away it would take a trifle over 5.55 seconds to reach the crossing without reduction of speed. If Herman was traveling twenty miles per hour, as the evidence shows, he would cover approximately thirty feet per second, and if he was at the westerly end of the tool house, a distance of at least one hundred and ninety-three feet away, when the train was about two hundred and fifty feet away, as both eye witnesses who testify for the plaintiff say, it would have taken Herman a little better than 6.4 seconds to reach the crossing. In that event there would have been no collision, for the train would have passed ahead of Herman. Herman must have been nearer the crossing. If at the easterly end of the tool house, he would have ninety-five feet to travel, which means 3.13 seconds to reach the crossing, and again there would have been no collision, for Herman would have passed ahead of the train. If we adopt two hundred and twenty feet as the distance of the train south of the crossing (distance apparently conceded and used by both sides in their briefs), then we find it would have taken the train practically 4.7 seconds to reach the crossing. Again wherever we place the automobile, whether at one hundred and ninety-three or ninety-five feet away, there would have been no collision. And likewise if we place the train at two hundred feet away. So that we find ourselves in the realm of speculation, and having to go outside the evidence in order to place both actors in the right positions to bring about the collision. The law will not permit this.

Plaintiff introduces evidence, through the same expert, to the effect that if the brakes on the train had been applied at a distance of two hundred, two hundred and twenty or two hundred and fifty feet away from the crossing, this would have allowed Herman time to get over the crossing. But this is on the supposition that Herman was then at the barway, or at least at the southerly end of the tool house. The computation is at first based on the premise that the brakes on the train would have been applied instantaneously, without giving time for the engineer to act, and would not have locked. If time is, as it must be, allowed the engineer to act, be that one or two seconds or thereabouts, the computation is of no assistance. It is based on a formula too complicated for the average layman to grasp and understand, and reduces speeds and distances to split seconds, too close to furnish a basis for legal discrimination. If the brakes would have locked, as they actually did in this case, the degree of retardation would have been less, since as agreed by the expert, it takes a longer distance to stop a train when the wheels lock than when they do not. The split seconds in which the expert deals then become more pronounced, and the resulting hazard all the more problematical. The greater emphasis laid on this kind of testimony, the deeper we enter in the field of speculation and conjecture, leaving no evidence sufficiently definite, reliable, and of probative value to base a finding of causal negligence on the part of the defendant.

*Judgment for the defendant.*

All concurred.